IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

In the Matter of the Complaint of §
ENSCO Offshore Company, as Owner §
of the modu ENSCO 74 for           §   CIV. A. NO. H-09-2838
Exoneration from or Limitation     §
of Liability,                      §

## OPINION AND ORDER

Pending before the Court in the above referenced cause for exoneration from or limitation of liability, pursuant to 46 U.S.C. § 30501, *et seq.*, civil and maritime, *inter alia* is Plaintiff Ensco Offshore Company's ("Ensco's") motion for partial summary judgment declaring that the measure of the claim for economic loss by High Island Offshore System, LLC ("HIOS") is a "no incident/incident" calculation, *i.e.*, the difference between the present value of the revenue steam with no incident and the present value of the revenue stream with the incident (instrument #96)

### Background Facts

Ensco was the sole owner of the Ensco 74, a self-elevating drilling unit and a registered vessel of Panama, Official No. 8764420, approximately 74.0918 meters long and 62.788 meters wide, and a depth of 7.924 meters.  On September 8, 2008 the Ensco 74 was located off the Coast of Louisiana in South Marsh 149 when Hurricane Ike approached.  Ensco claims that it followed its hurricane procedures, made fast the rig, and evacuated all

-1-

personnel.  On September 12, 2009, the Ensco 74 was swept off its location, leaving only its legs on the site, and was destroyed by Hurricane Ike.  The rig's barge was moved approximately 100 miles by the storm and sank sixty-five miles south of Galveston, Texas in High Island 241A.

On March 6, 2009 the M/V SATILLA allided with and was damaged by the remains of the ENSCO 74.  At that time the Ensco 74 had been missing and considered lost for six months, despite efforts of Ensco, C&C Technologies, NOAA, the U.S. Coast Guard, and third parties to locate it.  Ensco filed this action, and among the claimants who appeared and filed claims is HIOS (#15 and 16).

HIOS asserts that the Ensco 74 struck and seriously damaged its pipeline that ran across the seabed of the Gulf of Mexico and was used to transport natural gas from offshore production facilities to shore.  It claims that as a result of the damage, its pipeline was shut in for 104 days for repairs.  HIOS claims that Ensco was negligent in failing to design, maintain, and prepare the Ensco 74 properly for hurricane conditions and to implement an appropriate search, was guilty of statutory violations rendering it negligent *per se*, and is not entitled to exoneration from or limitation of liability because it had direct privity and knowledge of the matters that were the direct and proximate cause of HIOS's damages, and that the Ensco 74 was unseaworthy.  HIOS seeks damages against Ensco *in personam* and the Ensco 74 *in rem* in excess of

$26,500,000.00 plus interest.

## Standard of Review

Summary judgment under Federal Rule of Civil Procedure 56(c) is appropriate when "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R, Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A fact is material if it might affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of material fact is "genuine" if the evidence would allow a reasonable jury to find in favor of the nonmovant. *Id.* The court must consider all evidence and draw all inferences from the factual record in the light most favorable to the nonmovant. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986); *National Ass'n of Gov't Employees v. City Pub. Serv. Board*, 40 F.3d at 712-13.

The application of the rule depends upon which party bears the burden of proof at trial. If the movant bears the ultimate burden at trial, the movant must provide evidence to support each element of its claim and demonstrate the lack of a genuine issue of material fact regarding that claim. *Rushing v. Kansas City S. Ry.*, 185 F.3d 496, 505 (5th Cir. 1999), *cert. denied*, 528 U.S. 1160 (2000).

If the nonmovant bears the burden of proof at trial, the movant may either offer evidence that undermines one or more of the essential elements of the nonmovant's claim or point out the absence of evidence supporting essential elements of the nonmovant's claim; the movant may, but is not required to, negate elements of the nonmovant's case to prevail on summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Lujan v. National Wildlife Federation*, 497 U.S. 871, 885 (1990); *Edwards v. Your Credit, Inc.*, 148 F.3d 427, 431 (5th Cir. 1998); *International Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1264 (5th Cir. 1991); *Saunders v. Michelin Tire Corp.*, 942 F.2d 299, 301 (5th Cir. 19991).

If the movant meets this burden, the nonmovant must then present competent summary judgment evidence to support each of the essential elements of the claims on which it bears the burden of proof at trial and to demonstrate that there is a genuine issue of material fact for trial. *National Ass'n of Gov't Employees v. City Pub. Serv. Board*, 40 F.3d 698, 712 (5th Cir. 1994). "[A] complete failure of proof concerning an essential element of the nonmoving party's case renders all other facts immaterial." *Celotex*, 477 U.S. at 323.

"'[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment . . . .'" *State Farm Life Ins. Co. v.*

*Gutterman*, 896 F.2d 116, 118 (5th Cir. 1990), *quoting Anderson v. Liberty Lobby, Inc.*. 477 U.S. 242, 247-48 (1986).  "Nor is the 'mere scintilla of evidence' sufficient; 'there must be evidence on which the jury could reasonably find for the plaintiff.'"  *Id.*, *quoting Liberty Lobby*, 477 U.S. at 252.  The Fifth Circuit requires the nonmovant to submit "'significant probative evidence.'"  *Id.*, *quoting In re Municipal Bond Reporting Antitrust Litig.*, 672 F.2d 436, 440 (5th Cir. 1978), and *citing Fischbach & Moore, Inc. v. Cajun Electric Power Co-Op.*, 799 F.2d 194, 197 (5th Cir. 1986); *National Ass'n of Gov't Employees v. City Pub. Serv. Board*, 40 F.3d at 713.  Conclusory statements are not competent evidence to defeat summary judgment.  *Turner*, 476 F.3d at 346-479 (plaintiff "must offer specific evidence refuting the factual allegations underlying [defendant's] reasons for her termination), *citing Topalian v. Ehrman*, 954 F.2d 1125, 1131 (5th Cir. 1992).  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  *Thomas v. Barton Lodge II, Ltd.*, 174 F.3d 636, 644 (5th Cir. 1999), *citing Celotex*, 477 U.S. at 322, and *Liberty Lobby*, 477 U.S. at 249-50.

### Ensco's Motion for Partial Summary Judgment (#96)

Though denying any liability to HIOS, Ensco argues that if it is found liable, the proper measure of HIOS's claim for economic loss is no incident/incident.  HIOS, analogizing to the measure standardly used for deferred production, contends that it is a

traditional loss of use, i.e., alleged average daily lost revenue times the number of days of "deferred through put" of its pipeline. Ensco identifies the fundamental issue as how the Court accounts for the fact that the gas was still in the ground while the pipeline was shut in for repair.  Ensco maintains that the evidence shows that HIOS did not lose its pipeline revenue because of any other producer's transporting the gas destined for the HIOS gas pipeline on some other pipeline.  Instead the producers who used the damaged section of the HIOS pipeline simply shut in their own production facilities and wells until the HIOS pipeline was repaired and operating again.  Ex. 3, Affid., and Ex. 4, report of Ensco's expert, Calvin C. Barnhill, applying a no incident/incident calculation.[1]  The oil and gas remained in the ground until it could again be shipped through the HIOS pipeline.  No product was lost, but only deferred for 104 days, and ultimately the same volume of gas has been or will be shipped through the pipeline. HIOS will earn income on the same quantity of through put as though the damaging incident had never occurred.[2]

---

[1] Barnhill first calculated cash flow from shipping product through the pipeline as though no incident had occurred; next, the cash flow  from the deferred through put caused by the incident; and then discounted each cash flow to present value:  the difference is what he concludes in HIOS's economic loss.

[2] Ensco notes that while there may be factual issues such as the average daily through put, these issues are not relevant to the motion for partial summary judgment, which seeks only to establish the appropriate measure of economic loss, not a specific amount.

Ensco cites a line of cases supporting its contention.   In *Continental Oil Co. v. The SS Electra*, 431 F.2d 391 (1970), *cert. denied*, 401 U.S. 937 (1971), a vessel struck a production platform in the Gulf of Mexico owned by the four plaintiff oil companies, and the resulting severe damage necessitated shutting in the wells connected to the platform for 130 days.   Although the platform later suffered additional damages, the parties stipulated that 130 days would have been required to repair the damage done by the *Electra*.   Plaintiffs sought economic loss in the amount of $60,000, which was the net income that would have been realized from the wells connected to the platform during the shut-in period.   Faced with having to choose between net profits or interest on net profits as damages for a delay in production," the Fifth Circuit, although observing that plaintiffs had not lost oil or gas, noted that the only evidence before it was loss of profits,[3] applied the doctrine of *restitution in integrum,*[4] and awarded the plaintiffs lost profits even though they did not lose any oil and would presumably ultimately produce all of it and make the same profit.

_____

[3]   The panel did comment, "We need not consider whether lost profits or a fair return on investment is a better measure."  *Id.* at 393 n.3.

[4] Also called *restitutio in integrum*, the name of the doctrine means "'damages assessed against the respondent shall be sufficient to restore the injured vessel to the condition in which she was at the time the collision occurred . . . .'"  *Delta Towing LLC v. Basic Energy Services.*, No. 6:08CV0075, 2011 WL 102717, at *5 (W.D. La. Jan. 12, 2011), *quoting The Baltimore*, 75 U.S. 377, 385 (1869).

431 F.2d at 392 ("The oil companies do not claim for lost oil or
damage to oil as an asset.  Their suit is for damages suffered as
a consequence of the collision of the ship with the platform.").
The appellate court opined,

> Profit on oil production is simply one means of measuring
> the damage suffered.  The plaintiffs have lost the use of
> their capital investment in lease, platform and producing
> wells for 130 days during which that investment was tied
> up without return.  The fact that the same amount of
> profit can be made at a later time with the same
> investment of capital by removing from the ground a like
> quantity of oil at the same site does not alter the fact
> that the plaintiffs are out of pocket a return on 130
> days use of their investment.  Presumably the oil
> companies ultimately will produce from the reservoir all
> the oil that is economic to produce, but, as the District
> Court pointed out, it will require 130 days longer to do
> so.

 *Id.*

Subsequently in *Nerco Oil & Gas, Inc. v. Otto Candies, Inc.*,
74 F.3d 667 (5th Cir. 1996), the *MV Hatty Candies* struck and damaged
Nerco's oil and gas platform, resulting in a shut-in of three of
its wells from 31-50 days.  Nerco sought lost profits, in the
amount of $766,018, calculated by multiplying the days the wells
were shut in by their average daily production.  74 F.3d at 669,
670.  Defendant objected that lost profits would amount to double
recovery because the oil and gas were still in the ground and could
be produced subsequently.  The Fifth Circuit clarified its earlier
holding in *Electra*, 74 F.3d at 668-69,  emphasizing that the only
evidence before the Court in *Electra* was of lost profits, while in
*Nerco*, the defendant presented expert evidence in support of a "no

-8-

incident/incident" calculation (expected monthly production over life of production from the wells if there had been no incident, then the production with the incident, followed by discounting to present value of each of the two income streams), with the result being a loss of $140,987.  Observing that "the platform owners lost no oil or gas because of the accident," but that their "true damage . . . is that they will be required to remain at the site longer than expected to recover the oil and gas," the appellate court in *Nerco* ruled that no incident/incident was a better measure of a "fair return on [Nerco's] investment than the sum of the owners' loss of profits" because it awarded Continental for its return on its investment.  74 F.3d at 669-70.  The panel quoted from the *Electra* opinion, 431 F.2d at 392,

> The oil companies do not claim for lost oil or damage to oil as an asset.  Their suit is for damages suffered as a consequence of the collision of the ship with the platform.  Profit on oil production is simply one means of measuring the damage suffered.  The [platform owners] have lost the use of their capital investment in lease, platform, and producing wells for 130 days during which that investment was tied up without return.  The fact that the same amount of profit can be made at a later time with the same investment capital by removing from the ground a like quantity of oil at the same site does not alter the fact that the [platform owners] are out of pocket a return on 130 days of use of their investment. Presumably the oil companies ultimately will produce from the reservoir all the oil that is economic to produce, but, as the District Court pointed out, it will require 130 days longer to do so.  The [platform owners] must stay on the site 130 days longer, with investment in place, than necessary but for the ship's negligence.

> This is no theoretical, shadowy concept of loss.  It is squarely within the basic damage doctrine for marine

collision of *restitutio in integrum*, as applied in many comparable situations.

74 F.3d at 669.

Ensco maintains that since *Nerco*, the no incident/incident calculation has been the preferred measure of economic loss for deferred production. *See, e.g., Agip Petroleum Co. v. Gulf Island Fabrication, Inc.*, 17 F. Supp. 2d 660, 6661-62 (S.D. Tex. 1998)(holding that "[t]he practical and economic measure of an oil company's loss for delayed production is the difference between the net revenue flow with and without delay."); *In re the Matter of TT Boat Corp.*, No. Civ. A. 98-0494, 1999 WL 1276837, at *3-4 (E.D. La. Dec. 21, 1999)(though conceding the fair return on investment was not the only appropriate method of calculating damages for lost production and under some circumstances lost profits might be the best measure of delay damages, applying *Nerco* method of calculating damages); *Certain Underwriters v. Commerce & Industry Ins. Co.*, No. Civ. a. 97-0491, 2000 WL 98205, at *3 & n.5 (E.D. La. Jan. 27, 2000)(applying incident v. no incident methodology)(accepting calculation of expert Calvin Barnhill); *Asher Associates, LLC v. Baker Hughes Oilfield Operations*, No. 07-CV-1379, 2009 WL 4015580, at *2 (D. Colo. Nov. 18, 2009)("While lost profits may be an appropriate form of damages in the proper case, courts have noted that 'awarding a plaintiff net profits as compensation for deferred production is tantamount to a windfall to the plaintiff' and therefore other methodologies are preferable.").

### HIOS's Memorandum in Opposition (#109)

HIOS claims that repairs to its pipeline cost over $19.6 million.  It further points out that it is paid a fee for transporting natural gas through its 42" pipeline from various offshore production facilities owned by third parties to on-shore processing and distribution locations.  While the pipeline was shut in for repairs for 104 days, HIOS was unable to collect over $5.6 million in fees that it otherwise would have earned.  HIOS argues that it is entitled to recover the economic losses it incurred during the shut-in and the cost of physical repairs to the pipeline.  Ensco erroneously argues that HIOS can be fully compensated by an award of no more than $564,000.  Barnhill expert report, #96, Ex. 4, at p. 11; Barnhill Dep. Ex. A to #109, 49:20-50:2.

HIOS objects that Ensco's legal theory was developed in connection with "deferred production" claims and has never been applied to the type of claim at issue here, a claim for economic damages resulting from a transportation system being put out of service due to the negligence of a third party.  HIOS argues for application of the traditional loss of use method, employed in many other transportation cases.  The purpose of compensatory damages under general maritime law is "to place the injured person as nearly as possible in the condition he would have occupied if the wrong had not occurred."  *Freeport Sulphur Co. v. S/S Hermosa*, 526

F.2d 300, 304 (5th Cir. 1976).  "In cases of maritime collision, the maximum recoverable damages are those established by the doctrine of *restitutio in integrum*.  This principle measures damages as the 'cost of necessary repairs and the loss of earnings while they are being made."  *Transcontinental Gas Pipe Line Corp. v. Societe D'Exploration du Solitaire*, 299 Fed. Appx. 347, 350 (5th Cir. 2008), *quoting Delta Marine Drilling Co. v. M/V Baroid Ranger*, 454 F.2d 128, 129 (5th Cir. 1972)(doctrine of *restitution in integrum*, "strictly construed, would limit damages to the difference in the value of the vessel before and after collision.  However, that measure has long been equated with the cost of necessary repairs and the loss of earnings while they are being made.").

HIOS points to black letter law that "[d]amages for lost profits are allowed against a tortfeasor under the general maritime law."  *Domar Ocean Transp., Ltd. v. Indep. Refining Co.*, 783 F.2d 1185, 1191 (5th Cir. 1986).  "[T]he mere fact that such damages may not be susceptible of exact measurement does not make them any less recoverable."  *Rogers Terminal and Shipping Corp. v. Int'l Grain Transfer, Inc.*, 672 F.2d 464, 466 (5th Cir. 1982).  "Courts have wide discretion in determining the measure for computing loss of use of damages."  *Great Lakes Business Trust v. M/T Orange Sun*, 855 F. Supp. 2d 131, 151 (S.D.N.Y. 2012)(*citing Brooklyn Eastern Dist. Terminal v. United States*, 287 U.S. 170, 174 (1932)), *aff'd*, 523 Fed. Appx. 780 (2d Cir. 2013).  HISO urges that the Court should

-12-

simply multiply the volume of gas that it would have transported through its pipeline during the 104-day shut-in times the average unit transportation fee charged to HIOS's customers during that time.   HISO represents that Ensco's damages expert, Calvin Barnhill, would agree with its calculations of its damages.  Ex. A, Barnhill Dep., at 17:23-18:11.  Barnhill agreed that as of the end of 2008 (the year of the 104 day shut-in period, HIOS had lost revenue in the amount HIOS claims.  *Id.* at 38-39.

HIOS contends that Ensco's deferred production damage formula is inapplicable because it is "a unique methodology developed for cases involving oil and gas *producers*, i.e., the owners of oil and gas being brought to market."  #109 at p.4.  HIOS is not a producer and is not asserting a deferred production claim, but instead is a transporter or carrier of product owned by others.  Hios says it knows of no case where the deferred production model has been applied to a carrier or transporter of product owned by others.

Hios further observes that even if *Electra* is no longer controlling in deferred production cases based on *Nerco*, *Electra*'s general discussion of traditional loss of use damages is correct and relevant here:

> If the shipowner is carrying his own cargo and has another vessel available as a temporary replacement for the one under repair he has a duty to use it to mitigate damages and, having earned the profit with the otherwise idle replacement, cannot recover for detention of the vessel being repaired.  [Here, however] [t]here is no fleet of drilling platforms, no evidence that the plaintiffs had any other platform or could have set a

-13-

platform in place and obtained any of the 130 days' production.   The oil companies are like a single shipowner with his ship laid up.  *It would be no answer to his claim to assert that he has lost nothing because the same cargo is still on the dock when his ship comes out of repair and that he can move it then--if other cargoes are also then available.* [emphasis added]

431 F.2d at 393.  HIOS asserts that it is like the single shipowner in *Electra* and is not made whole, as Ensco argues, by the fact that the product HIOS would have transported during the 104 days of shut-in remains in the ground and will be carried eventually.   It urges the Court to find it is entitled to recover "detention," or loss of use, damages (in the form of revenue lost during the shut-in when its vessel is laid up for repairs due to the negligence of another (Ensco).   *See, e.g.*, *Marine Transport Lines, Inc. v. M/V Tako Invader*, 37 F.3d 1138, 1141 n.3 (5th Cir. 1995)(Defendant in this case argued, "[B]ecause the Marine Guardian was eventually able to make the voyage to Mexico for Exxon, 'the voyage was never lost, but rather, was only delayed.'  This argument is beside the point.   The Marine Guardian missed fourteen days of earning revenue.   Her ability to make a delayed voyage simply means she made one instead of possibly two voyages in the same amount of time."); *In re M/V Nicole Trahan*, 10 F.3d 1190, 1194-95 (5th Cir. 1994)(affirming award of detention damages where the vessel had "lost valuable time in a market ready for its services" as a result

of repair-related delays[5]); *Delta Steamship Lines, Inc. v. Avondale*

---

[5] This case relied on *Delta S.S. Lines, Inc. v. Avondale Shipyards*, 747 F.2d 995, 1000-01 (5th Cir. 1984), to calculate lost profits by showing lost opportunity:

> Loss of profit arising from a maritime casualty may be awarded so long as it is proved with reasonable certainty. This usually involves a showing in commercial cases that a vessel "has been engaged, or was capable of being engaged in a profitable commerce. . . ." "[M]ost clear, however, is the proof that MADS SKOU was in immediate demand, as were her sister ships, upon her return to service. This demonstrates 'that profits may be reasonably supposed to have been lost because the vessel was active in a ready market.'"

*Nicole Trahan*, 10 F.3d at 1194, *citing Avondale Shipyards*, 747 F. 2d at 1001, *citing The CONQUEROR*, 166 U.S. 110, 125 (1897).

In *The Conqueror*, which dealt with loss of use of a pleasure vessel when it was detained for about five months by a tax collector, the Supreme Court wrote that the law is well settled that

> the loss of profits or of the use of a vessel pending repairs, or other detention, arising from a collision or another maritime tort, and commonly spoken of as "demurrage," is a proper element of damages. . . . [I]t is equally well settled however, that demurrage will only be allowed when profits have actually been, or may be reasonably supposed to have been, lost, and the amount of such profits is proven with reasonable certainty.")

166 U.S. at 125. If further opined,

> It is not the mere fact that a vessel is detained that entitles the owner to demurrage. There must be a pecuniary loss, or at least a reasonable certainty of pecuniary loss, and not a mere inconvenience arising from an inability to use the vessel. In all cases in which we have allowed demurrage, the vessel has been engaged, or was capable of being engaged, in a profitable commerce, and the amount allowed was determined either by the charter value of such vessel, or by her actual earnings at about the time of the collision. . . . In other words, there must be a loss of profits in its commercial sense."

*Shipyards, Inc.*, 747 F.2d 995, 1002 (5th Cir. 1984)(noting that damages for loss of use are determined by "a simple calculation based upon the number of days the [vessel] was out of service . . . multiplied by the average daily lost profit for the vessel"). HIOS asserts that an award of loss of use damages is common when a plaintiff's vessel is forced out of service for repairs caused by another's negligence. *See generally* Thomas J. Schoenbaum, *Admiralty & Maritime Law* § 14-6 at 147 (5th ed. 2011)("In addition to physical damage, the owner of a vessel damaged through the fault of another is also entitled to an ward for actual profits lost during the detention necessary to make repairs."), *citing The Potomac*, 105 U.S. 630, 631-32 (1881); Gordon W. Paulsen, *Proven Damages in Collision Cases*, 51 Tulane L. Rev. 1047, 1053-54 (1997)("That the loss of profits or of the use of a vessel pending repairs or other detention, arising from a collision, or other maritime tort . . . is a proper element of damage, is too well settled both in England and America to be open to question"), *quoting The Conqueror*, 166 U.S. at 125.

In particular HIOS cites *Transcontinental Gas Pipe Line Corp.*, 299 Fed. Appx. 347 at 349, in which the court awarded plaintiff "its full repair costs as well as lost revenue" in the amount of

---

*Id.* at 133.  Recently courts of appeals have ruled that the loss of the use of a private pleasure boat is not compensable, and certainly where there is no history of income. *See, e.g., Northern Assur. Co. of America v. Heard*, 755 F. Supp. 2d 295, 298-301 (D. Mass. 2010)(and cases cited therein).

$654,742.  Although the decision does not address use of loss damages because the defendant did not dispute the amount sought by the pipeline owner, the plaintiff's post-trial brief, a copy of which is attached as exhibit B at p.4, shows that the plaintiff's figures were "based upon estimated daily volumes during the shut-in periods."  *See also Crown Zellerbach Corp. v. Willamette-Western Corp.*, 519 F.2d 1327, 1330 (9th Cir. 1975)(in a case brought in admiralty, the district court awarded a paper mill, damaged when the boom on a derrick barge severed a power line to it and caused operations at the mill to be suspended for thirty minutes, damages for loss of "productive capacity of the mill for the period in question, less . . . the usual production expenses"; the Ninth Circuit affirmed, finding the plaintiff "had established the value of its lost capacity by adequate proof.).

HIOS charges that Ensco's expert's application of the "deferred production" model is fundamentally flawed, based on erroneous assumptions, so even if his model were the correct one, it has been applied improperly to this case. While Barnhill is qualified to make economic calculations per se, Barnhill is not a lawyer.  HIOS asserts that the method employed in Barnhill's report is not scientifically or legally valid as applied to HIOS's claim.

Barnhill's main assumption in employing the deferred production analysis is that the lost revenue is not actually lost but merely deferred because the gas is still in the ground and will

ultimately be available for transportation.  Barnhill opines that
HIOS somehow made up the shortfall in twelve months, i.e., by the
end of 2009. Barnhill Dep., Ex. A at 38-39.  HIOS contends that
even if this were the appropriate analysis, Barnhill would have to
know and the Court would require evidence of the dates when the
product would be transported and in what amounts in order to
calculate the economic cost of the delay, i.e., lost profits and
the amount of the interest.  One would also have to know the life
expectancy of the pipeline or of the fields which produce into the
pipeline, information which Barnhill concedes he does not have.
Barnhill Dep., Ex. A at 8-9. 38.  HIOS maintains that

> the pipeline is expected to be functional for many
> decades into the future, especially since when the
> damaged section was removed and examined after this
> incident it was found to be in pristine condition.
> Additionally, even though the gas wells now feeding
> product into the pipeline will naturally decline over
> time, the pipeline is designed to accept new production
> from fields developed in the future.[6]  From the
> standpoint of available gas to transport, then, the work
> life of the pipeline is almost infinite.

#109 at 9.

In sum, HIOS claims that Ensco requests the Court to enter new

---

[6] HIOS cites Ex. C, Dep. of HIOS's Director of Offshore
Pipelines, Mike Stark ("Stark"), at 91-92, but HIOS attached the
wrong page.  Ensco attaches the correct page of Stark's deposition
to its Reply, #118, Ex. 5, 90-91.  Ensco points out that Stark
states that he is not qualified to answer the question, "As you
look at this [pipeline system] as an asset, in terms of the welds
you're servicing, what is kind of your anticipated lifetime for
this trunk line with all the feeders, in light of the fact that gas
wells deplete over time?"  *Id.*, 90:20-91:1

territory and employ an complex damage model developed in a different context to what HIOS characterizes as a simple and straightforward business interruption claim.

### Ensco's Reply (#118)

Identifying the issue as whether HIOS's claim for economic loss for damage to its pipeline is more like a claim for deferred production from an oil or gas well or more similar to a claim for detention of a ship, Ensco insists that the uncontested facts show that the wells attached to HIOS' pipeline are declining and that the pipeline has a short, limited useful life; thus they are similar to the deferred production, or incident/no incident, is the proper measure of HIOS's claim for economic loss. No product was lost and ultimately it will go through the pipeline.

Highlighting the lack of evidence to support HIOS's claims that the deferred production model does not apply because the pipeline is expected to function for decades and that new wells may be attached in the future so the pipeline's useful life is almost infinite, Ensco provides a number of documents submitted to the Federal Energy Regulatory Commission ("FERC") in rate case RP09-487-000 on March 31, 2009, three months after HIOS completed repairs to its pipeline, to present HIOS's position about what it expected of throughput in the future and evaluation of the prospects for its pipeline[7] in an effort to obtain relief for costs

---

[7] #118, Ex. 1, Molinari Dep. at 32:6-33:23.

associated with the 2008 hurricanes and the declining production from wells attached to its pipeline. Ex. 1, Dep. of Jeffrey Molinaro, who was Lead Rate Analyst in 2009 and has been promoted in April 2013 to Director of Rate and Regulatory Affairs for HIOS; Reply Exhibits 1,2,3,4, and 5 to Molinaro's Dep. These uncontroverted documents of analysis by qualified individuals reflect their opinions that "the proved and provable physical reserves attached to the HIOS pipeline will be depleted by 2018, that its "projections for new wells and tiebacks to deep water wells are speculative" and "HIOS has been unsuccessful in securing a connection to a deep water well for the prior eight years," and that the pipeline's useful economic life will end when the revenues decline below the cost of operations, estimated to happen by 2016.

Ensco argues that the effect of the testimony of these HIOS employees is to show that deferred production is the proper measure of HIOS' claim for economic loss to its pipeline. While HIOS cites *Electra* and argues that its pipeline is more like a ship than an oil or gas well, Ensco points out that a ship can go wherever its next cargo is and that during detention, the opportunity to carry cargo is not merely deferred, but lost. Thus lost profits may be the proper measure of economic loss for detention of a ship, but it is not the proper measure of economic loss for a pipeline that can only throughput gas from a limited number of declining wells attached to the pipeline. Unlike with a ship, there is only a

finite amount of gas that can ever be put through the HIOS line. If the well is shut in, production is deferred, not lost, as is what happened with the HIOS pipeline.  Given HIOS's own testimony that the pipeline had only another eight years of useful life, at most throughput was deferred to that limit.  Ensco again urges the Court to grant its motion and declare that the measure of HIOS's claim for economic loss is incident/no incident, i.e., the difference between the present value of the revenue stream with no incident and the present value of the revenue with the incident. #188 at pp. 4-5.

### Court's Decision

Having reviewed the briefing, the applicable law, and, importantly the particular circumstances of the incident here, the Court concludes for the reasons stated below that HIOS's measure of damages, i.e., repair costs plus the fees it would have obtained during the 104-day shut in, is correct if HIOS can prove them to a reasonable certainty.

"'A court of admiralty is, as to all matters falling within its jurisdiction, a court of equity.'" *Pizani v. M/V Cotton Blossom*, 669 F.2d 1084, 1089 (5th Cir. 19820, *quoting The Davit Pratt*, 7 Fed. Cas. 22, 24 (D. Me. 1839).  "'Its hands are not tied up by the rigid and technical rules of the common law, but it administers justice upon the large and liberal principles of courts which exercise a general equity jurisdiction.'" *Pizani*, 669 F.2d

at 1089, quoting *David Pratt*, 7 Fed. Cas. at 24.  The Fifth Circuit's decisions in maritime allision cases reflect that it finds no single measure of damages definitive when a production facility or a vessel is shut in for repairs because of damage caused by a negligent third party.  *See, e.g., Nerco*, 74 F.3d at 669 ("[O]ur holding in *Electra* did not determine that 'lost profits' was the required measure.  We only determined that it was one measure of damages and that it was abetter measure than interest on lost profits.").  In *Electra* the Fifth Circuit even noted that in traditional collision cases various alternative theories of damages may apply depending on the circumstances:  the value of hire of other vessels, the value of hire of the disabled vessel, the return on investment, or no damage at all.  431 F.2d at 393, *citing Brooklyn Eastern District Terminal v. United States*, 287 U.S. 170 (1932).  Instead, district courts have discretion to adopt any reasonable measure of damages that compensates the injured party in an effort "to place the injured person as nearly as possible in the condition he would have occupied if the wrong had not occurred." *Freeport Sulphur Co.*, 526 F.2d at 304.  The profits, nevertheless, must "must have actually been, or may be reasonably supposed to have been, lost, and the amount of such profits . . . proven with reasonable certainty." *The Conqueror*, 166 U.S. at 125.

As stated by HIOS, #109 at 4, as it relates to the facts here,

-22-

"The principle assumption underlying a 'deferred production analysis,' is that the lost revenue is not truly lost but is merely deferred as a consequence of the product (in this case, natural gas) being still in the ground and eventually available for transportation" by HIOS.  The deferred production measure is derived from a scenario where a negligent third party causes a delay in production of oil and gas[8] an owner/operator of offshore oil or gas reserves; the oil and gas remains in the ground until the owner/operator is able to produce it.  HIOS' "lost profits" do not come from production of oil and gas since it does not own the wells or the gas; HIOS's profits come from the fees it charges the producers of the oil and gas to move it through HIOS's pipeline. Because of the shut-in, it was deprived use of the pipeline and therefore collection of those fees for the period of repairs to its pipeline.  No double recovery could accrue to HIOS after the repair period because the 104 days, when it would have been transporting oil and gas and collecting fees days but could not, were permanently lost.[9]

     For these reasons, the Court finds that the "better" measure

_____

     [8] The Fifth Circuit has defined "'production'" as "'the actual physical severance of minerals from the formation.'"  *Nerco*, 74 F.3d at 670-71, quoting *Diamond Shamrock Exploration Co. v. Hodel*, 853 F.2d 1159, 1168 (5th Cir. 1988).

     [9] The Court is assuming that HIOS does not have an alternative, unused pipeline that could transport the oil and gas until the damaged pipeline was repaired.

of damages, in addition to repair costs, is the "fair return on investment," or lost fees HIOS would have charged during the period, contemplated in *Electra* but not awarded because the vessel did not argue or produce evidence on that model. *Nerco*,74 F.3d at 669, *citing The Potomac*, 105 U.S. 630, and *Electra*, 431 F.2d at 392. "The recovery of loss of earnings has often depended upon the circumstances of the accident." *Nerco*, 74 F.3d at 669. If Ensco is held liable, HIOS will have to prove its lost earnings to a reasonable certainty or it will not be awarded damages for lost earnings. *Id.* Analogizing to the damaged vessel in *The Conqueror*, 166 U.S. at 133, to recover those fees HIOS will have to show that its pipeline "has been engaged, or was capable of being engaged in a profitable commerce" during the 104 days it was shut in, i.e., that the "profits may be reasonably supposed to have been lost because the [pipeline] "was active in a ready market." *M/V Nicole Trahan*, 10 F.3d at 1194, *citing Delta S.S. Lines, Inc.*, 747 F.2d at 1001.

Accordingly, the Court

ORDERS that Ensco's motion for partial summary judgment is DENIED.

**SIGNED** at Houston, Texas, this  7th  day of  January , 2014.


_____
MELINDA HARMON
UNITED STATES DISTRICT JUDGE

-24-