IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

In the Matter of the Complaint of  §
ENSCO Offshore Company, as Owner   §
of the Modu ENSCO 74 for           §   CIV. A. NO. H-09-2838
Exoneration from or Limitation     §
of Liability                       §
                                   §

**OPINION AND ORDER**

Pending before the Court in the above referenced cause of

exoneration from or limitation of liability pursuant to 46 U.S.C.

§ 30501, *et seq.*,[1] civil and maritime, is Plaintiff ENSCO Offshore

---

[1] The Limitation of Liability Act  provides in relevant part,

(a) **In general.**--Except as provided in section 30506 of
this title, the liability of the owner of a vessel for
any claim, debt, or liability described in subsection (b)
shall not exceed the value of the vessel and pending
freight. . . .
(b) **Claims subject to limitation.**--Unless otherwise
excluded by law, claims, debts, and liabilities subject
to limitation under subsection (a) are those arising from
any embezzlement, loss, or destruction of any property,
good, or merchandise shipped or put on board the vessel,
any loss, damage, or injury by collision, or any act,
manner, or thing, loss, damage, or forfeiture, done,
occasioned, or incurred, without the privity or knowledge
of the owner.

46 U.S.C. § 30505.  Once a claimant proves that negligence or
unseaworthiness caused an accident, to be entitled to limitation
the owner of the vessel seeking limitation bears the burden of
showing that it lacked privity or knowledge of the condition, i.e.,
the cause of the loss.  *In re Signal Intern., LLC*, 579 F.3d 478,
496 (5th Cir. 2009), *quoting Gateway Tugs, Inc. v. Am. Commercial
Lines, Inc. (In re Kristie Leigh Enters., Inc.)*, 72 F.3d 479, 481
(5th Cir. 1996).  "'Privity or knowledge,' sometimes described as
'complicity in fault,' extends beyond actual knowledge to
knowledge that the shipowner would have obtained by reasonable
investigation.'"  *Id., quoting Cupit v. McClanahan Contractors,*

-1-

Company's ("ENSCO's") motion for summary judgment against Sea Robin Pipeline Company, LLC ("Sea Robin") (#98) on the grounds that Sea Robin cannot prove the ENSCO 74 allided with Sea Robin's pipeline.

### Background Facts

ENSCO was the sole owner of the ENSCO 74, a self-elevating drilling unit and a registered vessel of Panama, Official No. 8764420, approximately 74.0918 meters long and 62.788 meters wide, and a depth of 7.924 meters.  It weighed approximately 16.1 million pounds.  On September 8, 2008 the ENSCO 74 was located off the Coast of Louisiana in South Marsh 149 when Hurricane Ike approached.  ENSCO claims that it followed its hurricane procedures, made fast the rig, and evacuated all personnel.  On September 12, 2009, at approximately 9:00 a.m. according to experts, the ENSCO 74 was swept off its location, with the barge ending up floating upright in the Gulf of Mexico, while the rig

---

*Inc.*, 1 F.3d 346, 348 (5th Cir. 1993), *quoting Brister v. AWI, Inc.*, 946 F.2d 350, 356, 358 (5th Cir. 1991).  *See Complaint of Bowmech Marine, Inc.*, Civ. A. No. 91-2409 *et al.*, 1992 WL 266098, at *3 (E.D. La. Sept. 24, 1992), *aff'd*, 15 F.3d 500 (5th Cir. 1994)("'[A] corporate shipowner may be deemed to have constructive knowledge if the unseaworthy or negligent condition could have been discovered through the exercise of reasonable diligence.'"), *citing Brister*, 946 F.2d at 355.  Moreover, "knowledge of certain corporate employees may be attributed to the business entity.  Because a corporation is a legal fiction which must act through individuals, 'the privity and knowledge of individuals at certain level of responsibility must be deemed the privity and knowledge of the organization, 'else it could always limit its liability.''"  *Id.*, *quoting Continental Oil Co. v. Bonanza Corp.*, 706 F.2d 1365, 1376 (5th Cir, 1983), *quoting Corvell v. Jahncke Service, Inc.*, 341 F.2d 956, 958 (5th Cir. 1965).

broke free of its legs just below the barge, leaving only parts of two of its three legs on the drill site, and was destroyed by Hurricane Ike.   The rig was moved approximately 100 miles northwesterly by the storm and finally sank sixty-five miles south of Galveston, Texas in High Island 241A.

According to ENSCO, on March 6, 2009[2] the M/V SATILLA allided with and was damaged by the remains of the ENSCO 74.   At that time the ENSCO 74 had been missing and considered lost for six months, despite efforts of ENSCO, C&C Technologies, the National Oceanic and Atmospheric Administration ("NOAA"), the U.S. Coast Guard, and third parties to locate it.   ENSCO filed this limitation of liability action, and among the claimants who appeared and filed claims is Sea Robin (#10, 11, and 39-3).

Sea Robin asserts that when the ENSCO 74 broke away from the sea floor, it drifted west, crossing and damaging Sea Robin's pipeline at East Cameron Blocks 300, 315, 317, and 334.   ENSCO 74's location was revealed when the M/V Satilla allided with its submerged remains.   Sea Robin claims that ENSCO was negligent in failing to secure the ENSCO 74, in failing to follow recommended procedures of the Mineral Management Service in advance of approaching storms, in failing to perform an appropriate search for the ENSCO 74, in putting a damaged drilling rig weakened by

---

[2] Sea Robin states that the allision occurred on March 7, 2009.

previous hurricanes or otherwise unseaworthy back out to sea, and in failing to implement safeguards to prevent such damage if the ENSCO 74 broke loose of its moorings.  Sea Robin states that under general maritime law, the negligence of a defendant is presumed when a drifting vessel strikes a fixed object, based on the logical deduction that a drifting vessel was mishandled or improperly moored.[3]  Moreover Sea Robin explains that it had entered into

_____

[3] *Pioneer Natural Resources USA, Inc. v. Diamond Offshore Co.*, 638 F. Supp. 2d 665, 688 & n.142 (E.D. La. 2009), *citing The Louisiana*, 70 U.S. (3 Wall) 164, 173 (1965); and *James v. River Parishes Co.*, 686 F.2d 1129, 1132-33 (5th Cir. 1982).  The presumption generally shifts the burden of proof--both the burden of producing evidence and the burden of persuasion--to the vessel, which must show by a preponderance of the evidence that it was without fault or that the collision was caused by the fault of the stationary object or was the result of inevitable accident." *Id.* at 689, *citing Bunge Corp. v. M/V Furness Bridge*, 558 F.2d 790, 795 (5th Cir. 1997), *cert. denied*, 435 U.S. 924 (1978).  The vessel can meet this burden by demonstrating "that the accident could not have been prevented by 'human skill and precaution and a proper display of nautical skills.'  Defendants ''must exhaust every reasonable possibility which the circumstances admit and show that in each they did all that reasonable care required.''" *Id.* at 689 and n. 155.  While it is true that in pipeline damage actions, **maritime law** permits proof of causation by inferences based on circumstantial evidence, in a suit in **admiralty** the plaintiff must prove causation by a preponderance of evidence, direct and/or circumstantial evidence.  *Pioneer*, 638 F. Supp. 2d at 688-89.  Where an Act of God or *vis major* is alleged to have caused a vessel to break its moorings, to defend against a presumption of negligence the vessel bears a heavy burden to affirmatively show that its "'drifting was the result of an inevitable accident, or a *vis major*, that human skill and precaution and a proper display of nautical skill could not have prevented.'" *Bunge Corp.*, 240 F.3d at 926, *quoting The Louisiana*, 70 U.S. 164, 173 (1865); *Petition of U.S.(Dammers & Van der Heide Shipping & Trading (Antilles)*, 425 F.2d 291, 995 (5th Cir. 1970).  One who invokes the defense of Act of God must prove not only that "the weather was heavy, but also that it 'took reasonable precautions under the circumstances as known or reasonably to be anticipated.'"  *In re Southern Scrap*

agreements with oil and gas producers in the Gulf of Mexico to transport their product through its pipeline, but because of the damage the pipeline was shut in and could no longer transport production.   One of these companies, Energy Resource Technology GOM, Inc. ("ERT"), filed suit against Sea Robin seeking damages for lost revenues and escalating shipping costs that ERT has sustained because it is unable to transport production through Sea Robin's pipeline.   Medco Energi US LLC ("Medco"), which owns and operates platforms located in Blocks 317 and 318B of the East Cameron area of the Gulf and whose production from these platforms was transported to market through Sea Robin's pipeline pursuant to a contract between Medco and Sea Robin, has also filed suit against Sea Robin.   Sea Robin seeks to recover specifically for damage to

---

*Material Co.,* 713 F. Supp. 2d 568, 5 (E.D. La. 2010), *quoting Petition of United States, Inc. v. Steamship Joseph Lykes)*, 425 F.2d 991, 995 (5th Cir. 1970).

A party asserting an Act-of-God defense must show not only that the weather was extreme, but that it "took reasonable precautions under the circumstances as known or reasonably anticipated" to prevent the damage.  *Petition of U.S.*, 425 F.2d 991, 995 (5th Cir. 1970).  "[H]uman negligence as a contributing cause defeats any claim to the 'Act of God' immunity because of an 'Act of God' is not only one which causes damage, but one as to which reasonable precautions and/or the exercise of reasonable care by the defendant could not have prevented the damage from the natural event."  *Crescent Towing & Salvage Co., Inc. v. M/V Chios Beauty*, Civ. A. No. 05-4207, 2008 WL 3850481, at *14 (E.D. La. Aug. 14, 2008). *See also Union Pac. R. Co. v. Heartland Barge Mgmt., LLC*, Civ. a. Nos. H-02-0438 *et al.*, 2006 WL 2850064, at *13 (S.D. Tex. Oct. 3, 2006)("[A]n act of God is defined as any accident due directly and exclusively to natural causes without human intervention, which by no amount of foresight, pains, or care, reasonably to have been expected, could have been prevented.").

its pipeline, lost revenue due to interruption in service of the pipeline, and costs of surveying the damage to the pipeline, as well as reimbursement, indemnification or contribution resulting from any liability it is found to have to ERT or Medco, whether through tort, contract or otherwise.  Sea Robin further claims that ENSCO is not entitled to limitation or exoneration because all of its negligent actions were within its privity and knowledge.

### Standard of Review

Summary judgment under Federal Rule of Civil Procedure 56(c) is appropriate when "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R, Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  A fact is material if it might affect the outcome of the suit under the governing law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute of material fact is "genuine" if the evidence would allow a reasonable jury to find in favor of the nonmovant.  *Id.*  The court must consider all evidence and draw all inferences from the factual record in the light most favorable to the nonmovant.  *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986); *National Ass'n of Gov't Employees v. City Pub. Serv. Board*, 40 F.3d at 712-13.

The application of the rule depends upon which party bears the

burden of proof at trial.  If the movant bears the ultimate burden at trial, the movant must provide evidence to support each element of its claim and demonstrate the lack of a genuine issue of material fact regarding that claim.  *Malacara v. Garber*, 353 F.3d 293, 403 (5th Cir, 2003); *Rushing v. Kansas City S. Ry.*, 185 F.3d 496, 505 (5th Cir. 1999), *cert. denied*, 528 U.S. 1160 (2000).  The nonmovant must then respond with evidence that raises a genuine issue of material fact to avoid summary judgment against it; a "complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  *Celotex*, 477 U.S. at 323.

If the nonmovant bears the burden of proof at trial on an issue, the movant may either offer evidence that undermines one or more of the essential elements of the nonmovant's claim or point out the absence of evidence supporting essential elements of the nonmovant's claim; the movant may, but is not required to, negate elements of the nonmovant's case to prevail on summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Lujan v. National Wildlife Federation*, 497 U.S. 871, 885 (1990); *Edwards v. Your Credit, Inc.*, 148 F.3d 427, 431 (5th Cir. 1998); *International Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1264 (5th Cir. 1991); *Saunders v. Michelin Tire Corp.*, 942 F.2d 299, 301 (5th Cir. 19991).  "[A] complete failure of proof concerning an essential element of the nonmoving party's case renders all other facts

-7-

immaterial." *Celotex*, 477 U.S. at 323. The nonmovant cannot rely on unsubstantiated allegations, but must set forth specific facts showing the existence of a genuine issue of material fact on every element of its cause of action. *Nat'l Ass'n of Government Employees v. City Public Service Bd. of San Antonio*, 40 F.3d 698, 712 (5th Cir. 1994). If a rational trier of fact could not find for the nonmoving party based on the evidence it presents, there is no genuine issue of material fact for trial. *Id.* at 712-13, *citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 584-88 (1986).

"'[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment . . . .'" *State Farm Life Ins. Co. v. Gutterman*, 896 F.2d 116, 118 (5th Cir. 1990), *quoting Anderson v. Liberty Lobby, Inc.*. 477 U.S. 242, 247-48 (1986). "Nor is the 'mere scintilla of evidence' sufficient; 'there must be evidence on which the jury could reasonably find for the plaintiff.'" *Id.*, *quoting Liberty Lobby*, 477 U.S. at 252. The Fifth Circuit requires the nonmovant to submit "'significant probative evidence.'" *Id.*, *quoting In re Municipal Bond Reporting Antitrust Litig.*, 672 F.2d 436, 440 (5th Cir. 1978), and *citing Fischbach & Moore, Inc. v. Cajun Electric Power Co-Op.*, 799 F.2d 194, 197 (5th Cir. 1986); *National Ass'n of Gov't Employees v. City Pub. Serv. Board*, 40 F.3d at 713. Conclusory statements are not competent evidence to defeat

summary judgment.  *Turner*, 476 F.3d at 346-479 (plaintiff "must offer specific evidence refuting the factual allegations underlying [defendant's] reasons for her termination), *citing Topalian v. Ehrman*, 954 F.2d 1125, 1131 (5th Cir. 1992).  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Thomas v. Barton Lodge II, Ltd.*, 174 F.3d 636, 644 (5th Cir. 1999), *citing Celotex*, 477 U.S. at 322, and *Liberty Lobby*, 477 U.S. at 249-50.

### Relevant Law

The elements of an action for negligence under general maritime law are "essentially the same as land-based negligence under the common law": "'a duty owed by the defendant to the plaintiff, breach of that duty, injury sustained by [the] plaintiff, and a causal connection between the defendant's conduct and the plaintiff's injury." *In re Great Lakes Dredge & Dock Co., LLC*, 624 F.3d 201, 211 (5th Cir. 2010), *quoting Withhart v. Otto Candies, LLC*, 431 F.3d 840, 842 (5th Cir. 2005), and *Canal Barge Co. v. Torco Oil Co.*, 220 F.3d 370, 376 (5th Cir. 2000).  Determination of a tortfeasor's duty, which is "a duty of ordinary care under the circumstances," is a question of law for the court.  *Id*.  "'Duty . . . is measured by the scope of the risk that negligent conduct foreseeably entails.'" *Consolidated Aluminum Corp. v. C.F. Bean Corp.*, 833 F.2d 65, 67 (5th Cir. 1987), *citing* Harper, James & Gray, *The Law of Torts, Scope of Duty in Negligence Cases* § 18.2 at 655

(2d ed. 1986).  Determination of whether there was a breach of a duty is for the trier of fact.  *In re Great Lakes*, 634 F.3d at 211.

"'Under general maritime law, a party's negligence is actionable only if it is the 'legal cause,' of the plaintiff's injuries,'" a standard that requires "something more than 'but for causation [--] the negligence must be a substantial factor' in causing the injuries.''"  *In re Great Lakes*, 624 F.3d at 213-14, *quoting Donaghev v. Ocean Drilling & Explor. Co.*, 974 F.2d 646, 649 (5th Cir. 1992).  To prove causation, Sea Robin must show that the ENSCO 74 more probably than not caused the damage to the Sea Robin Pipeline.  *In re Great Lakes*, 624 F.3d at 211-12 ("To be foreseeable, the harm alleged must bear some proximate relationship with the negligent conduct such that it can reasonably be said to be within the 'scope of risk' created by the conduct.")(finding victims failed to allege which act by which of a number of companies that performed dredging cause their injury).  The claimant must show that the Limitation petitioner reasonably should have foreseen the consequences leading to the claimant's damages; "harm is not foreseeable unless 'it might have been anticipated by a reasonably thoughtful person, as a probable result of the act or omission."  *Id.* at 211, citing Consolidated Aluminum, 833 F.2d at 68.  The vessel owner must have "'knowledge of a danger, not merely possible, but probable.'"  *Id., quoting Republic of France v. U.S.*, 290 F.2d 395, 401 (5th Cir. 1961).  *See also In re: Cooper/T.*

*Smith*, 929 F.2d 1073, 1077 (5th Cir. 1991)(To prevail on a claim for maritime negligence a plaintiff/claimant must show (1) that the defendant owed a duty to the plaintiff, (2) that the defendant breached that duty, (3) that the plaintiff sustained an injury, and (4) that the defendant's conduct was the actual and proximate cause of the plaintiff's injury.), *citing Thomas v. Express Boat Co.*, 759 F.2d 444, 448 (5th Cir. 1985).

Proximate cause is more than "but for" causation; "the negligence must be a 'substantial factor' in the injury." *Thomas*, 759 F.2d at 448.

Moreover, the result must be reasonably foreseeable. *In re Cooper/T. Smith*, 929 F.2d at 1077. "The test of foreseeability is not measured against normal conditions, but those that were anticipated or reasonably should have been anticipated." *In re Signal Intern., Inc.*, 579 F.3d 478, 493 (5th Cir. 2009), 833 F.2d 65, 68 (5th Cir. 1987)(holding that foreseeability incorporates "the interplay of natural forces"), and *In re Kinsman* Transit Co., 338 F.2d 708, 724 (5th Cir. 1964)("[W]here . . . the damage was caused by just those forces whose existence required the exercise of greater care than was taken--the current, the ice, and the physical mass of the [vessel], the incurring of consequences other and greater than foreseen does not . . . provide a reasoned basis for insulation."). In *In re Signal*, the court found that "the approaching hurricane, the expected height and predicted movement

-11-

of storm surge, and the typology of the Pascagoula basin gave rise to the need to moor the barges and made this allision a foreseeable consequence of negligence in that mooring" and therefore the damage was within the scope of duty owed to the owner of the damaged bridge. *Id.* at 493, 495–96.

When a maritime action involves an allision,[4] the Supreme Court has recognized two presumptions of fault. In *THE LOUISIANA*, 3 Wall. (70 U.S.) 164, 173 (1866), it found a presumption of fault that when a drifting vessel allides with a stationary object, she must be liable for the resulting damages "unless she can show affirmatively that the drifting was the result of inevitable accident, or a vis major, which human skill and precaution and a proper display of nautical skill could not have prevented.").[5] The rationale for this presumption of negligence is the logical deduction that a drifting vessel was mishandled or not properly moored. *Pioneer Natural Resources USA, Inc. v. Diamond Offshore Co.*, 638 F. Supp. 2d 665, 689 (E.D. La. 2009). In *THE OREGON*, 158 U.S. 186 (1895), it applied a presumption of fault that shifts the burden of production and persuasion to a moving vessel that under

---

[4] "An allision is a collision between a moving vessel and a stationary object." Thomas J. Schoenbaum, *Admiralty & Maritime Law* § 14-2 (4th ed. 2004).

[5] *See, e.g., In re Katrina Canal Breaches Consol. Litig.*, Civ. A. No. 05-4182, 2011 WL 1792542, at *1 (E.D. La. Jan. 20, 2011)(The *LOUISIANA* rule "imposes a presumption of fault on a vessel that breaks free from its moorings and drifts into a stationary object.").

her own power allides with a stationary object. *See Combo Maritime, Inc. v. U.S. United Bulk Terminal, LLC*, 615 F.3d 599 604-05 (5th Cir. 2010)(discussing the two presumptions and noting that "[b]oth of these presumptions are closely related to the doctrine of *res ipsa loquitur* which creates a rebuttable presumption of fault on the part of the person controlling the instrumentality. . . . [A]lthough the two presumptions apply to different types of vessels--vessels under their own power and drifting vessels--the courts treat them similarly, looking to law on one to inform decisions on the other.")(*citing* Schoenbaum, *Admiralty & Maritime Law* § 14-3, and *Fischer v. S/Y NERAIDA*, 508 F.3d 586, 593 (11th Cir. 2007)(doctrines are the same except the vessels to which they apply)). Here, because the ENSCO 74 was adrift, the *LOUISIANA* rule applies.   Under both doctrines, the burden of production and persuasion on the issue of fault shifts to the other party. *Id.* at 605.  The presumption applies unless the drifting vessel can "show that her drifting was the result of an inevitable accident or a vis major, which human skill and precaution and a proper display of nautical skill could not have prevented." *Petition of U.S.*, 425 F. 2d at 995.  "If the drifting vessel offers a defense of unavoidable accident or vis major, '[t]he burden of proving inevitable accident or Act of God rests heavily upon the vessel. . . .'" *James v. River Parishes Co.*, 686 F.2d 1129, 1132 (5th Cir. 1982).  The vessel "'must exhaust every reasonable possibility which circumstances

admit and show that in each [it] did all that reasonable care required.'" *Bunge Corp. v. M/V Furness Bridge*, 558 F.2d 790, 795 (5th Cir. 1997), *cert. denied*, 435 U.S. 924 (1978).   The moving vessel may rebut the presumption of fault against it by showing by a preponderance of the evidence that the allision (1) was the fault of the stationary object, (2) that the moving vessel acted with reasonable care, or (3) the allision was an unavoidable accident. *Pioneer Natural Resources USA, Inc. v. Diamond Offshore Co.*, 638 F. Supp. 2d 665, 688 (E.D. La. 2009), *citing Bunge Corp. v. M/V Furness Bridge*, 558 F.2d 790, 795 (5th Cir. 1977), *cert. denied*, 435 U.S. 924 (1978).   Once evidence is produced for review by the court, the presumptions become "superfluous" and no longer apply and the plaintiff must prove by a preponderance of the evidence the elements of general negligence (duty, breach, causation and injury), as is the case here. *Combo Maritime,* 615 F.3d at 605.

A key element of an allision claim, and the focus of the motion for summary judgment here, is that the offending vessel or her equipment actually made contact with the stationary object, here a subsea pipeline. *Pioneer Natural Resources USA, Inc. v. Diamond Offshore Co.*, 638 F. Supp. 2d 665 (E.D. La. 2009).   In admiralty actions, the plaintiff, or the claimant, may prove its claim by a preponderance of the evidence by either direct or circumstantial evidence. *Pioneer Natural Resources USA, Inc. v. Diamond Offshore Co.*, 638 F. Supp. 2d 665, 689 (E.D. La. 2009);

*Skidmore v. Grueninger*, 506 F.2d 716 (5th Cir. 1975).  In addressing pipeline damage caused by allision, maritime law permits proof of causation by inferences arising from solely circumstantial evidence because the law generally makes no distinction between direct and circumstantial evidence.  *Pioneer*, 638 F. Supp. 2d. at 688-89.

Nevertheless, when "'circumstantial evidence is relied upon to prove a fact, the circumstances must be proved and cannot be presumed.'"  *AEP Elmwood, LLC v. Tesoro Marine Services, LLC*, No. Civ. A. 02-3570, 2004 WL 1575545, at *4 (E.D. La. July 13, 2004), *citing Montgomery-Ward & Co. v. Sewell*, 205 F.2d 463, 467 (5th Cir. 1953).  "When a plaintiff relies solely on circumstantial evidence to show negligence and recover damages against the defendant, the plaintiff must produce evidence which must exclude every other reasonable hypothesis that the accident happened and damages resulted as plaintiff contends.  *Id., citing McClendon v. T.L. James & Co.*, 231 F.2d 802, 806 n.4 (5th Cir. 1956).  "'Taken as whole, circumstantial evidence must exclude other reasonable hypotheses with a fair amount of certainty.  This does not mean, however, that it must negate all other possible causes.'"  *Id., quoting Houston-New Orleans, Inc. v. Page Engineering Co.*, 353 F. Supp. 890 (E.D. La. 1972).  "Other possible causes of an accident which are 'remote, conjectural and speculative . . . as a possible cause in fact' may be disregarded.'"  *Id., citing id.* at 896.

**ENSCO's Motion for Summary Judgment and Memorandum (#98)**

ENSCO insists that Sea Robin cannot meet its burden to prove that the ENSCO 74, floating on the surface, allided with Sea Robin's pipeline, which was at least 195 feet below the surface. Supported by substantial documentary evidence, ENSCO claims that after four independent surveys of the pipeline by experts, the factual evidence shows that Sea Robin's pipeline sustained no strike damage, no kinks, no dents, and no internal dents on its top or sides[6] and that the sea floor around the damaged portion of the pipeline was undisturbed and void of any drag marks that might indicate that it came into contact with the pipeline at the point where the pipeline ruptured.  ENSCO maintains that Sea Robin has been unable to produce any evidence that its rig contacted Sea Robin's pipeline.  Absent proof of contact between a vessel and a subsea pipeline, dismissal of Sea Robin's claims is appropriate. *Pioneer Natural Resources USA, Inc. v. Diamond Offshore Co.*, 638 F. Supp. 2d 665 (E.D. La. 2009).  Moreover the rupture occurred forty miles from where the remains of ENSCO 74 sank to the bottom in High Island Block 241.  ENSCO further asserts that Sea Robin's surveyors, engineers, and experts have conceded that hurricane forces moved the pipeline out of its original built location on September 12, 2008.  After the storm, ENSCO conducted aerial searches for the pipeline without success.

---

[6] The only physical damage to the pipeline was longitudinal scratches on the bottom of the pipeline.

After Hurricane Ike passed, the government issued a Notice to Leasees to inspect their pipelines.  Sea Robin found that its 30" pipeline was no longer buried, but had been moved by the storm.  It hired Cal Dive to dig a trench to re-bury the pipeline.

ENSCO points out that while Cal Dive buried that section of pipeline several weeks before the rupture of the pipeline on July 31, 2009, Cal Dive used a jet sled over the rupture spot at least eleven times and, then again, over what became a second rupture site on September 13, 2009.  #98-1, Ex. 1, Sea Robin representative Butch Till Deposition, p. 134, ll.2-8; Ex. 2 Rick Reggio Deposition., p. 22, ll. 2-8.  Cal Dive made several unsuccessful passes with a "European Device" moving along the pipe and digging a trench ten feet under the pipe, but went back to using "a normal everyday jet sled." *Id.*, Ex. 1 at p. 134, l.9-p. 135, l. 16. Reggio and Till testified that the equipment kept getting stuck on the pipeline.  Ex. 1, p. 34, l.9-p. 135, l.16; Ex. 2, p. 30, l.24-p. 32, l. 25.  They requested a Monster Jet Sled, which they used to complete the remaining passes.  Ex. 1, p. 134-p. 135, l. 16 & Exs. 3,4 and 5, picture of jet sled used and a diagram showing how it is configured.  Cal Dive finished the work in June of 2009.  The Monster Jet Sled also got stuck a number of times.  Ex. 1, p. 134, l. 9-p. 135, l. 16 and Ex. 2, p. 30, l.24-p. 32, l. 25.  *See also* Exs. 6 (photograph) & 7 (diagram) of where pipe was scratched.  The damage is comprised of longitudinal scratches in a rake-like

pattern on the bottom of the pipe at the 4 o'clock to 8'oclock sections of the pipe.[7]  ENSCO argues that it is common sense that the sled was getting stuck and scraping along the bottom portion of the pipeline, the section that was damaged, and that the burial of the pipeline within 30 days before the rupture probably caused the scrape marks and the rupture.  The first rupture of the pipeline occurred ten months after the hurricane.  ENSCO insists that Sea Robin must, but cannot, prove that the ENSCO 74 more likely than not caused the damage to the pipeline.

Although Sea Robin argues that the ENSCO 74 hit the pipeline ten months earlier, ENSCO points out that the bottom portion of the deepest leg only extended less than 22 feet beyond the bottom of the floating rig, and for the rig to have hit the pipeline it would have had to sink 200 feet to the bottom, hit the pipeline, then risen to the surface, and moved on to its ultimate location.  #98-1, p. 6.[8]

---

[7] ENSCO observed that the Monster Jet Sled had rigid piping and a set of nozzles that extended below the pipeline, which, if they contacted the pipe, would for a rake-like patter of scratches on the pipe.  #127 at p. 9.  If the led hit an obstruction on one side of the pipe, the rigid piping and the nozzles would rotate under the pipe.  *Id*. at p. 10.

[8] At another point in its memorandum, #98-1, p. 8, ENSCO writes,

> As the pipe was sitting on the seafloor, the deck of the rig would have to sink 160 feet below the surface, the rig leg scoop under the pipeline, drag  along its underside for two non-contiguous sections totaling 1,200 feet without disturbing any portion of the seafloor.

ENSCO asserts that since this theory is not credible, Sea Robin changed its theory and now its drift pattern expert, Kenneth Smith, contends that the rig stayed on the surface of the water with its leg extending below and that the end of the leg slid under the pipe without disturbing the seafloor. Sea Robin claims that a cross-braced reinforced steel rig leg split in half lengthwise, that the two halves slid down the leg, and one half hooked onto the bottom of the other half, doubling the length of the leg so that it could reach down 200 feet. #98-1 at p. 8; Ex. 11, Kenneth Smith Dep., p. 113, ll. 3-25. Insisting there is no evidence to support this speculative theory, ENSCO responds that not only does Sea Robin fail to show any drag scars close to the point of rupture or identify any portion of the rig that matches this scenario, but the leg would have left a drag scar from the rupture site to the final wreck location since the seafloor became shallower as the rig moved towards shore, and the scar made by the "mystery leg" would have alerted Sea Robin where to find the rig or at least a piece of the leg. Nor can Sea Robin show a drift pattern crossing the three known locations:  the starting point, the spot where ENSCO 74

------

Furthermore, it would have to keep all of its equipment on deck and return to the surface after sinking to a depth of 200 feet.  It is also important to note that there was absolutely no damage on either the top or the side of the pipe. [Ex. 8, Messman Dep. p. 18, ll. 4-9]

Moreover, it comments that once a rig weighing 15.5 million pounds loses buoyancy and descends approximately 200 feet below the surface, it does not rise and travel another 40 miles.

capsized and debris fell to the bottom, and its end location.  #11 at p. 140, l.18-p. 147, l.3; p. 153, l. 6-p. 157, l. 20l p. 164, l. 20-p. 172, l.4.  Unsubstantiated theories will not defeat a summary judgment.  *Gateway Offshore Pipeline Co. v. M/V Antalina*, Civ. A. No. 4:10-CV-860, 2012 WL 3930316, *6 (S.D. Tex. Sept. 10, 2012). The only evidence that Sea Robin has is that the rig was large and adrift in the Gulf of Mexico.

Moreover, four independent surveys of the seafloor arranged for by Sea Robin did not find any drag scars or bottom deformity, nor did they find any equipment from the rig.  Ex. 8, Jim Messman deposition, p. 93, ll. 8-5 and pp. 70-71; Ex. 16, Meehan deposition, pp. 40-41.  Although Sea Robin conducted a number of offshore surveys (by International Offshore Services in March 2009, and by T. Baker Smith, by C&C Technologies, and by Deep Marine Technology ("DMT")[9]) on behalf of Cal Dive, as well as inspections, Sea Robin has not discovered nor produced any evidence that the rig contacted its pipeline.  Ex. 1, p. 111, ll. 6-16, and pp. 122-23. DMT employed an inspection class ROV to "fly" the line and look for

---

[9] ENSCO states that both T. Baker Smith and C&C Technologies found no evidence of damage to the pipeline.  T. Baker Smith preformed its first survey in January 2009 and found movement of the pipe was consistent with hurricane forces.  Ex. 9, Stuart Babin Deposition, p. 49, l.13-p. 50, l.8.  C&C reviewed T. Baker Smith's data and conducted another survey to try to find evidence that the ENSCO 74 hit the pipeline, but it also found no evidence of trauma or breakage by third parties, but found the pipeline moved due to natural forces.  Ex. 10, Scott Croft Deposition, p. 178, p. 171, l,14-p. 173, l. 5.

damage, but its dive videos show its built position was no longer buried and that there was no sign of damage to the pipeline or surrounding seafloor. Ex. 8, p. 78, ll. 1-15. ENSCO contends that none of these surveys by firms hired by Sea Robin proves that the ENSCO 74 caused any damage to Sea Robin's pipeline; in fact they support the opposite conclusion.

ENSCO points out that the survey by T. Baker Smith on May 23-24, 2000 was performed before Hurricane Ike. It found that the pipeline was out of position when compared to the "as built" drawings and that 44% of the pipeline (49,246 feet) was no longer buried and was sitting 75-350 feet out of its "as built" location. Ex. 9, Babin Deposition, pp. 14-17. Babin testified that it was not unusual for pipelines to move during storms in the Gulf of Mexico. *Id.* at p. 12, ll. 19-22. T. Baker Smith's survey provides a base line, which ENSCO claims proves that the damage in dispute is hurricane-related and not caused by contact with the ENSCO 74. T. Baker Smith performed another survey after Hurricane Ike on January 21-23, 2009. Ex. 9, Babin Deposition, p. 18, ll, 18-22. It found further movement of the pipeline and determined that 100 % of the pipeline was fully exposed and no longer buried. *Id.* at p. 23, ll. 1-16.[10] T. Baker Smith believed, based upon

_____

[10] Sea Robin states that this survey revealed for the first time that the West Leg of the pipeline system had been displaced in an oxbow shape between Eastern Cameron Block ("EC") 334 and EC 300, but that it did not reveal any damage to the pipeline itself. #110, citing #110, Ex. 1, Messman Deposition at p. 33, ll.3-23; p.

seafloor evidence, that the pipeline was moved solely by hurricane forces. *Id.* at p. 27, ll.8-p. 32, l.1.  At the point of greatest difference between the two surveys, the pipeline had moved 1,230 feet out of position from its earlier pre-Hurricane Ike surveyed location. *Id.* at p. 53, l.20-p. 54, l. 6.  T. Baker Smith found the pipeline was not grabbed by anything because T. Baker Smith found no kinking and no floor scarring, as opposed to what it expected to find had the pipeline been grabbed. *Id.* at p. 33 at ll. 4-24, p. 52 at ll. 4-9.  Babin also testified that he found no evidence indicating that the ENSCO 74 had been in the area or come into contact with Sea Robin's pipeline. *Id.* at p. 35, ll. 11-21. He found only movement of the line that was caused by hurricane forces because the sonar images showed a smooth seafloor with few drag scars, none of which were near the pipeline, and the area near the rupture site did not have any seafloor scarring. *Id.* at p. 49, l.13-p.50, l. 8.

In another survey performed by T. Baker Smith on August 3-5, 2009, after the rupture, to examine an area 2000 feet radius away from the rupture and three miles down from the rupture to see what caused the rupture, it found no evidence that anything came into contact with the pipeline and that the only scarring on the seafloor was the result of the blowout. *Id.* at p. 61, ll. 9-17. It also described what kind of evidence would be expected when a

---

129, l. 25-p. 131, l. 16.

rig or an anchor hits a pipeline and that such was not found in the survey.  *Id.* at p. 117, ll. 9-17.

The data for T. Baker Smith's first survey was sent to the engineering firm of Kiefner & Associates to evaluate.  Ex. 12, Robert Francini Deposition, p. 16, ll. 4-18.  Kiefner found that although the pipeline had been bowed, it was sufficiently structurally sound to be serviceable.  *Id.*  The engineers further found the damage was consistent with that usually caused by the movement of pipelines during hurricanes because of hurricane forces.  *Id.* at p. 18, ll. 9-16.  They did not see any evidence that the ENSCO 74 contacted the pipeline.  *Id.* at p. 18.

Next Sea Robin hired C&C Technologies to review the data from T. Baker Smith and conduct another survey of the location.  C.C. Technologies, too, after examining the pipeline twice, found that the pipeline was damaged by movement caused by the hurricane and found no evidence showing that the ENSCO 74 came into contact with the pipeline.  Ex. 8, Jim Messman Deposition, p. 62, ll. 1-25; p. 66, l. 16-p. 67. l.2.

Finally, Sea Robin hired Tesla Offshore to survey the pipeline and the structures attached to it.  Tesla's survey confirmed the others' findings.  Ex. 13, Corporate Representative George Loy's Deposition, p. 55, l.15-p. 56, l. 5; p. 47, ll. 16-23.

At Sea Robin's request, Cal Dive also looked for evidence that the pipeline came into contact with the ENSCO 74 but did not find

-23-

any.  #8, Messman Deposition, p. 78, ll. 1-15; Ex. 10, Scott Croft Deposition at p. 169.  Cal Dive examined the entire pipeline, using a ROV, prior to rupture and after rupture, worked on repairs and looked for signs of contact, but its divers found only normal wear and tear and no evidence of contact with ENSCO 74.  #8 at p. 79, ll. 2-16; p. 78, ll. 1-5.

Sea Robin's expert on pipeline stability, Gerhardus Koch of DNV, performed a detailed analysis of the pipeline and of the currents during Hurricane Katrina.  He also determined that the pipeline's movement was caused by hurricane forces and that the currents created by Hurricane Ike moved the pipeline about 1,200 feet out of its "out built" position.  #14, Koch Deposition, p. 17, ll. 18-24.  He also did not see any evidence that indicated that the ENSCO 74 came into contact with the pipeline.  *Id.* at p. 14, l. 22-p. 15, l. 2.

Sea Robin's expert metallurgist, Lee Swanger, determined that the rupture of the pipeline was caused by gouges on the bottom of the pipeline, but had no evidence as to what caused these gouges.  Swanger testified that Sea Robin's attorney, Mr. Ordeneaux, told Swanger that there were "puncture marks in the seabed [near the point of rupture] that a portion of the legs of the rig could have made if it were bouncing in the waves and contacting the seabed," but that Swanger had not seen them.  #15, Swanger Deposition at p. 29, l.4-p. 30, l. 14.

In sum, argues ENSCO, Sea Robin has not and cannot meet its burden to show that the rig caused the damage to its pipeline.  See Ex. #8, Messman Deposition, pp. 70-71; Ex. 16, Meehan Deposition, pp. 40-41; #1, Ex. 1, Till Deposition, p. 21, l. 25-p. 123, l. 9. It cannot explain how ENSCO's rig could have damaged a pipeline 195 feet below the surface, it cannot show a drift pattern that crosses the three known locations of ENSCO, it cannot explain the lack of drag marks and debris from the ENSCO 74 near the pipeline, it cannot explain why the pipeline is scraped only on the bottom, and it cannot show the date on which the pipeline was damaged.  Thus ENSCO is entitled to a summary judgment dismissing Sea Robin's claims against it and the ENSCO 74.  *Gateway Offshore Pipeline Co. v. M/V Antalina*, Civ. A. No. 4:10-CV-860, 2012 WL 3930316 (S.D. Tex. Sept. 10, 2012)(granting summary judgment where Gateway was unable to provide evidence showing that the M/V Antalina's anchor caused the damage to Gateway's pipeline).[11]

### Sea Robin's Memorandum in Opposition (#110-116)

Insisting that it never claimed that the ENSCO 74 alone caused

---

[11] Sea Robin claims that the facts here are distinguishable from those in *Gateway Offshore Pipeline*, in which a vessel's functioning AIS produced evidence that confirmed that the vessel did not pass within 19 miles of the pipeline in dispute, in the following ways:  (1) there were no witnesses to the path of the ENSCO 74 or its striking of Sea Robin's pipeline; and (2) there is no direct evidence of the rig's path because the ENSCO 74 lacked a functioning tracking system after it left station, preventing ENSCO from tracking its rig in real time and any party from later determining the rig's path.

-25-

the pipeline to displace out of its pre-storm location, Sea Robin
concedes that hurricane forces "would have undisputably caused the
pipeline to move," but argues that "hurricane forces did not
extensively gouge and scratch steel pipe and/or pipe coating over
a distance of 2,000 feet" because such damage could only have been
done by "a heavy steel object." #110 at p. 7. It points to the
fact that martensite,[12] which both parties' expert metallurgists
agree existed at the likely origin of the rupture,[13] must have
formed due to the heat generated to over 1500 degrees by frictional
rubbing against the pipe by the ENSCO 74, which crossed the Gulf of
Mexico at approximately 10 miles per hour and weighed approximately
16,000,000 pounds. It  emphasizes that no other jack up drilling

---

[12] According to Sea Robin, in addition to mechanical damage to
the pipe, a layer of carbon steel was transformed into martensite
at the likely point of the rupture of the pipeline. #113, Ex. 9,
Dep. of George Vander Voort, ENSCO's expert, at p. 387. Martensite
only forms from steel with the carbon content of Sea Robin's
pipeline if it is heated to least 1550 degrees Fahrenheit and
quickly cooled. The metal quenches due to the rapid cooling,
causing microscopic cracks in the layer of martensite. #113, Ex.
8, Swanger Affidavit, ¶¶ 8-10. The martensite allegedly caused a
rupture of the pipeline at an internal pressure of approximately
900 psig, less than the routine operating pressure of 1,050-1,150
psig before the hurricane. #110, at pp. 4-5 and 7. Ex. 1, Messman
Dep., p.52, ll. 1-5. Vander Voort testified that it was more
probable than not that the failure would not have occurred if the
cracks had not been there. #113, Ex. 9 at p. 390, l. 24-p. 391, l.
9. He also testified that to create the layer of martensite
observed would require abrasion by rubbing against it with enough
energy to heat the pipeline to a temperature of 1550 degrees
Fahrenheit. *Id.* at p. 254, l.4-p. 255, l. 12.

[13] #113, Ex. 9, Dep. of George Vander Voort, at p. 387 (finding
martensite within an inch of the oxbow bend).

rig crossed the area during Hurricane Ike and there is no evidence that any other vessel of any kind with the ability to contact the pipeline crossed the pipeline near the location of the damage. Furthermore Sea Robin points to the deformation of the pipeline's steel, i.e., the gouges or scratches which indisputably were the result of contact with another object.  Basic physics establishes that to scratch or gouge an object, the offending object must be at minimum at least fractionally harder than the object it is scratching or gouging.  Sea Robin's metallurgist testified that the gouging required more energy than that required to form martensite. #113, Ex. 10, Swanger Deposition and exhibits, p. 24, l. 11-p. 25, l. 12.  Sea Robin calls the martensite "the closest thing to a witness which exits in this case."  #110 at p.22.   Moreover Sea Robin emphasizes that ENSCO concedes for purposes of the motion for summary judgment that mechanical damage to the pipeline caused the rupture on July 31, 2009.

Vander Voort opined that, in addition to the jet sled repair a month before the rupture ("the most likely source"), the mechanical damage to the pipeline could have preexisted Hurricane Ike and that the additional stress of the hurricane that moved the pipeline caused the rupture.  Sea Robin argues that these potential causes can be conclusively dismissed.  Regarding the jet sled, Sea Robin asserts that Vander Voort's opinion is largely based on his assumption that the ENSCO 74 could not have contacted the pipeline,

-27-

not on a specific scientific principle.   Swanger, a qualified
mechanical engineer and a metallurgist, testified in an affidavit
(#113, Ex. 8, ¶¶ 9-16) that he ruled out a jet sled as a possible
cause of damage because based on a momentum calculation to
determine what force the jet sled was capable of transferring to
the pipeline during operations: (1) a minimum force of 32,000
pounds is required, applied perpendicular to the pipeline, to make
martensite; (2) his research showed the largest jet sleds are
usually 80 tons, or at least 75 times smaller than the ENSCO 74;
(3) one inch of rubbing travel in less than 6 milliseconds was
required so that the water and steel did not prevent the steel from
reaching at least 1500 degrees Fahrenheit to a depth of at least 5
millimeters; (4) he concluded from work records that the fastest
speed recorded for the jet sled during the whole process was 23.7
feet per minute, or just under .4 feet per second or just over one-
fourth of a mile per hour; (5) the jet sled was towed parallel, not
perpendicular, to the pipeline and any downward movement would have
lacked sufficient force to jam the steel nozzles against the
pipeline with even 32,000 pounds of force[14]; (6) even the biggest

---

[14] ENSCO points out that the lay barge that was towing the jet
sled across the seafloor had the ability to apply forces 3-4 times
higher than needed to generate the forces that scratched the pipe.
The jet sled was pulled by the winch on the L/B PECOS that
was cable of exerting 110,000 pounds of force.  #127, Ex. 16, copy of
the Specification Sheet for the L/B PECOS.  If the jet sled gets
stuck, as the records show it did, the winch could exert four times
the tension needed to scratch the pipe and form martensite.

jet sleds are not capable of imposing enough force on the pipeline, and even their fastest speed is much too slow to cause martensite to form; and (6) the ENSCO 74 has sufficient mass and velocity and was traveling fast enough to cause the damage to the pipeline. #133, Ex. 8, Swanger Affidavit, ¶¶ 9-16 and Ex. 2 to affidavit.

Sea Robin observes that ENSCO relies on the timing of the burial operation and the testimony of Rick Reggio, Sea Robin's engineering consultant for repairs. Sea Robin maintains the timing was irrelevant because from the time of Hurricane Ike until the pressure test resulting in the July 31, 2009 rupture, the pipeline was never under pressure. Moreover ENSCO has presented no evidence that there was ever any contact between a jet sled and the pipeline. Reggio testified that the pipeline would damage the jet sled before the opposite occurred because of the force and strength of materials. #113, Ex. 11, p. 107, l.16-p. 108, l. 17. Sea Robin emphasizes that there were no other repairs near the location of the damaged pipeline before the rupture. The damage to the pipeline was on the bottom. The pipeline lay on the seafloor undisturbed from the time of Hurricane Ike until the time of the burial of the pipeline, with no intervening hurricanes. There was no opportunity for damage to occur.

Sea Robin argues that the damage could not have existed before Hurricane Ike. Kiefner and Associates calculated that in movement of the pipeline, the highest bending strain was .02%, way below the

.76% critical buckling strain for the line, and determined that the bending would not have damaged an otherwise sound pipeline. #110, Ex 1, Messner Dep., p. 224, l. 23-p. 226, l. 12. Swanger testified that the strength of the pipeline had been "proof-tested" by prior operation of the pipeline at an internal pressure of at least 1,035 psig. Clearly the internal operating pressure of 910 psig caused less stress than the earlier internal pressure. Bending strain does not increase axial stress at neutral axes, such as the 6 o'clock position where the origin of the rupture occurred. Swanger calculated that axial stress on the pipe due to .02% bending strain of 6,000 psi would only have existed at the 3 o'clock or 9 o'clock position, whichever was in compression. If the movement of the pipeline contributed to the failure of the pipeline, the rupture would have occurred on the axis affected by the movement since the pipeline performed under greater stress just before the storm. Instead it occurred where the martensitic cracks and mechanical deformation were found, a location that only developed after September 9, 2008.

In summary in this case, Sea Robin maintains, the rights of the parties must be determined by a preponderance of the evidence, and reliance on circumstantial evidence that supports the inference of causation and negligence is permissible. *Marathon Pipe Line*, 527 F. Supp. at 831. Expert Ken Smith's testimony shows that the ENSCO 74 more than likely crossed over the Sea Robin and that after

losing station, the rig's remaining legs had the capability to, and more likely than not did, strike the pipeline. Testimony of ENSCO's path expert Tom Burns shows that evidence of the exact path of the rig is inconclusive. Sea Robin also raises its expert Smith's theory about the rig's legs breaking jaggedly at different levels on each of the four chords of the four-chorded structure, dropping and extending deeper into the water, making contact with the pipeline, which Sea Robin proclaims far more plausible than ENSCO's opinion that the rig capsized and lost buoyancy. This evidence raises a genuine issue of material fact sufficient to preclude summary judgment, Sea Robin insists.

Sea Robin further argues that sonar survey evidence is uncertain or equivocal and that the appearance of the seafloor can change with the passage of time. That evidence should therefore be discounted.

Sea Robin maintains that since the parties' expert opinions greatly differ, and therefore the factfinder must make credibility determinations,[15] the Court's finding of a genuine issue of material fact would preclude the grant of summary judgment on the negligence claims. Sea Robin's expert, Kenneth Smith, finds the probable path of the ENSCO 74 as crossing over Sea Robin's pipeline. He also presents a theory about two legs of the ENSCO 74 breaking off and

_____

[15] The Court observes that this standard may apply at trial, but not at summary judgment.

the remaining third one extending below the bottom of the hull, combined with the draft and motion of the hull in the storm, to demonstrate so that it probably made contact with and damaged the pipeline. Sea Robin also points to its metallurgist expert's opinion that the gouges in the pipeline contained a change in the metal composition that could only have been caused by a structure with force similar to a drifting rig. Sea Robin emphasizes that there is no evidence that any other rig crossed over the pipeline before, during or after the hurricane. It further insists that ENSCO's efforts to blame the damage on the hurricane and a jet sled used during repair operations are ineffective because neither scenario is physically and thus reasonably possible. Sea Robin urges that in this "battle of the experts," the Court "should hear the testimony of the opposing experts to determine their credibility and weigh each party's evidence."[16]  #110 at pp. 18–19. Even ENSCO's experts will agree that the ENSCO 74 crossed the pipeline within three miles of the damage to the pipeline and that no other rigs or vessels capable of causing the damage were so near.

### ENSCO's Reply (#127)

---

[16] The Court notes that under black letter law it may not do either in reviewing motions for summary judgment. *Total E&P USA, Inc. v. Kerr-McGee Oil and Gas Corp.*, 719 F.3d 424, 434 (5th Cir. 2013)("In determining whether a case presents triable issues of fact, . . . the district court may not make credibility determinations or weigh the evidence . . . ."), *citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)..

The key issue here is whether the ENSCO 74 contacted Sea Robin's pipeline.  ENSCO contends that after four years all Sea Robin provides is forty pages of potential scenarios that possibly might have occurred where ENSCO 74 could possibly have caused damage to the pipeline, but without a single piece of evidence showing that it did.  It is Sea Robin's burden to prove causation, but it has provided no fact indicating that ENSCO 74 came into contact with its pipeline: there are no drag scars caused by the rig; there is not a single piece of rig equipment that was lost in the area of the alleged contract; it cannot explain how a rig floating 200 feet above the pipeline contacted the pipeline, no less that it got under the pipeline to cause damage on two portions of the underside of pipe that was sitting in the mud.

ENSCO claims it has met its burden to show that there is no evidence that ENSCO 74 struck the Sea Robin pipeline.  The burden has shifted to nonmovant Sea Robin to show more than some metaphysical doubt that ENSCO 74 more probably than not was the cause of damage to Sea Robin's pipeline, i.e., evidence upon which a judge or jury could reasonably base a verdict in its favor.  *In re Great Lakes Dredge & Cock Co., LLC*, 624 F.3d at 211; *Anderson*, 477 U.S. at 248.  According to ENSCO, because "Sea Robin's story defies physics, reason and is void of any physical evidence," it has failed to meet its burden.  For example, since the pipeline was sitting on the seafloor, (1) the deck of the rig would have to sink

160 feet below the surface, (2) the leg of the rig would have to scoop under the pipeline and drag along its underside for two **non**-contiguous sections totaling 1200 feet without disturbing any portion of the seafloor and leaving the top and side of the pipe undamaged, and (3) the ENSCO 47 would have to keep all of its equipment on deck and return to the surface after sinking to the depth of 200 feet. Even Sea Robin's engineer expert, Kenneth Smith, testified that an object weighing over 16,000,000 traveling at 8 and one-half knots per hour would create "a lot of force (#127, Ex. 15 at pp. 120-23)," yet there is no evidence of any contact between the rig and the pipeline or any portion of the sea floor in the vicinity of the rupture site. Smith further testified that it is not possible, using his drift model, for the rig to have left from its starting point, made contact with the pipeline, crossed the debris field, and ended up where it sank. *Id.* at pp. 164-72. Sea Robin's contention that the rig may have passed over the pipeline does not satisfy its burden on causation. That assertion does not provide any evidence that the rig struck the pipeline, no less that it came into contact with the pipeline below the mud line and left no mark on the seafloor. Although Sea Robin argues that possible evidence of drag scars and/or rig equipment could have been covered over during the months after the storm, ENSCO points out that bottom surveys by Sea Robin's experts provide important details about the pipeline's performance in the storm,

including "wall marks" caused by the pipeline's slow movement on the seafloor and various pock marks caused by vessels anchored in the area that were not covered up, yet somehow all of the evidence created by the rig disappeared.  Sea Robin fails to identify a single seafloor disturbance where the rupture occurred.

Moreover since there is no evidence that the pipeline was damaged in September 2012, it makes more sense that the burial of the pipeline that occurred after these seafloor surveys were conducted caused the damage to the pipeline.

### Sea Robin's Surreply (#30)

Sea Robin objects to ENSCO's submission of the specifications of the L/B PECOS.  The Specifications are not an expert opinion calling into doubt Swanger's calculations and opinion that the jet sled is a possible cause of the damage to the pipeline nor physical evidence of contact between the sled and the pipeline, but merely an argument.  It cannot overcome the principle establishing that the jet sled could not cause the martensitic deposit at the site of the rupture.  Swanger determined that the force applied to the jet sled by the towing barge is parallel, not perpendicular, to it.  He also found that if the jetting nozzles were to make contact with the pipeline, they would only inadvertently brush against it, without the force to scratch or puncture.  Swanger also concluded that the jet sled was far too slow to have caused the martensitic transformation or the indelible witness mark in the steel of the

pipeline.   Sea Robin argues that on summary judgment review all
evidence produced by the nonmovant is taken as true and all
inferences are drawn in the nonmovant's favor.  *Bejil v. Ethicon,
Inc.*, 269 F.3d 477, 479 (5th Cir. 2001).

### Court's Decision

A threshold question in this limitation of liability action is
whether ENSCO owed a duty of care to Sea Robin.  In *In re Signal*,
579 F.3d at 491-96, the Fifth Circuit provided a lengthy discussion
of legal principles that applied in determining whether the owner
of two barges that broke loose from their moorings on the
Pascagoula River, Mississippi during Hurricane Katrina and allided
with and damaged a bridge of Interstate 10, approximately five
miles away, owed a duty of care to the Mississippi Department of
Transportation ("MDOT") regarding the bridge.  Judge Carolyn King,
writing for the panel, opined,

> "Duty . . . is measured by the scope of the risk
> that negligent conduct foreseeably entails."  *Consol.
> Aluminum*, 833 F.2d at 67. . . . [T]he determination of
> duty "involves a number of factors, including most
> notably the foreseeability of the harm suffered by the
> complaining party." [*Id.*] (citing, e.g., PROSSER AND
> KEETON ON TORTS § 53 (5th ed. 1984)); *see generally* [1
> DAN B. DOBBS, THE LAW OF TORTS] at 466 [(2001)] ("The
> defendant is liable for harms he negligently caused so
> long as a reasonable person in his position should have
> recognized or foreseen the general kind of harm the
> plaintiff suffered."); 3 FOWLER V. HARPER ET AL., HARPER,
> JAMES AND GRAY ON TORTS § 18.2, at 762 (3d ed. 2007)("The
> obligation to refrain from that particular conduct is
> owed only to those who are foreseeably endangered by the
> conduct and only with respect to those risks or hazards
> whose likelihood made the conduct unreasonably
> dangerous."); . . . . "Foreseeability obviously marks the

limits placed on a defendant's duty; the precise meaning of the concept is vital." *Consol. Aluminum*

"The test [of foreseeability] is whether the harm that does occur is within the *scope of danger* created by the defendant's negligent conduct. 3 [STUART M. SPEISER ET AL., THE AMERICAN LAW OF TORTS 71 (2008)]; *see also* 1 DOBBS . . . at 463["[F]oreseeability is a short hand expression intended to say that the scope of the defendant's liability is determined by the scope of the risk he negligently created.") Although we sometimes speak in terms of probability, we do so not in a mathematical, more-likely-than-not usage, but in terms of the "natural and probable" risks that a reasonable person would likely take into account in guiding her practical conduct. *See* [*Republic of France. v. United States*, 290 F.2d 395, 401 (5th Cir. 1961)]; *Consol. Aluminum*, 833 F.2d at 68 ("[F]oreseeability . . . includes whatever is likely enough in the setting of modern life that a reasonably thoughtful person would take account of it in guiding practical conduct.") . . . The scope of danger incorporates "not only those [natural] forces which are constantly and habitually in operation but also those forces which operate periodically or with a certain degree of frequency." *Republic of Fr.*, 290 F.2d at 400. . . .

*In re Signal*, 579 F.3d at 491-92. Asking "whether the allision with the Interstate 10 bridge was a harm of the general sort to an entity of a general class that a reasonably thoughtful person might have anticipated to result from Signal's negligent mooring" of the barges "in light of the anticipated natural forces wrought by Hurricane Katrina," Judge King wrote,

[O]ur analysis does not focus on the particular allision site, but the general risk of allision; it does not focus on MDOT, but on the class of property owners in the paths available to the runaway barges. We agree with the district court that the risk of allision with a fixed structure located within the reach of the anticipated storm surge was foreseeable if the barges broke free due to negligent mooring. Allision with fixed structures is one of the principal risks of a vessel, moored inland, that breaks from its negligently executed moorings.

-37-

*Id.* at 492.   Rejecting Signal's attempt to narrow the inquiry to the specific risk of allision with the particular portion of the Interstate 10 bridge, Judge King continued, "We find no principled reason to break with our precedent that guides our determination by reference to the general sorts of harms that are reasonably foreseeable consequences of the scope of danger risked by the negligence involved. *See Consol. Aluminum*, 833 F.2d at 68." *Id.* at 493.   She further observed, "[N]either the distance covered by the barges nor the lack of typically navigable waters around the allision site rendered the allision unforeseeable.   The test of foreseeability is not measured against normal conditions, but those that were anticipated or reasonably should have been anticipated. *See Consol. Aluminum*, 833 F.2d at 68 (holding that foreseeability incorporates 'the interplay of natural forces"); *In re Kinsman Transit*, 338 F.2d 708, 724 (2d Cir. 1964)]("[W]here . . . the damage was caused by just those forces whose existence required the exercise of greater care than was taken--the current, the ice, and the physical mass of the [vessel], the incurring of consequences other than and greater than foreseen does not . . . provide a reasoned basis for insulation.") . . . ." *Id.* at 493.   The panel examined the pre-storm forecast for Hurricane Katrina, considered the storm's expected height and predicted movement, and decided that the storm, as it came in, corresponded to the predicted Category 4 and "exposed the barges to anticipated forces."   It also

found that Signal foresaw that in a large storm its vessels would escape from the mooring site and its own witnesses testified that if they broke free from faulty mooring they would leave the sheltered mooring areas and enter into the general river.   There were no natural or man-made obstructions between the mooring site and the bridge.  *Id.* at 494.  It concluded that these factors made it foreseeable to a reasonably thoughtful person that the barges could reach the bridge.  *Id.*  The panel held that "'where, as here, the damages resulted from the same physical forces whose existence required the exercise of greater care than was displayed and were of the same general sort that was expectable, unforeseeability of exact developments . . . will not limit liability." *Id.* at 495*, quoting In re Kinsman*, 338 F.2d at 726.   Furthermore, "[t]he allision was a harm of the general sort to an entity of the general class that might have been anticipated by a reasonably thoughtful person as a probable consequence of the negligent mooring of the barges on the Pascagoula River in light of the interplay of the expected storm surge and the surrounding typology." *Id.* at 496. It concluded that Signal owed a duty to MDOT because the allision with the bridge was foreseeable and Signal was not entitled to exoneration.  *Id.* at 496.

This Court first observes that although it would be Sea Robin's burden, neither party has addressed, no less produced evidence showing, whether ENSCO owed a duty of care to Sea Robin.

In a limitation of liability action, the claimant, here Sea Robin, normally bears the burden of proving by a preponderance of the evidence, by either direct or circumstantial evidence, that the vessel owner was negligent, a claim which includes the element of causation. *Pioneer*, 638 F. Supp. 2d at 689.

Nevertheless, as noted, under general maritime law and the *LOUISIANA* rule, when a drifting vessel propelled by current or wind, such as the ENSCO 74, strikes and causes damage to a stationary object like an undersea pipeline on the seafloor, there is a strong presumption that the owner of  moving ship was negligent and at fault. *Bunge*, 240 F.3d at 923; *Fischer v. S/Y NERAIDA*, 508 F.3d at  503, *citing The LOUISIANA*, 70 U.S. 164; and *River Parishes Co.*, 686 F.2d at 1132-33.  That presumption shifts the burden of producing rebuttal evidence and the burden of persuasion to the vessel owner.  Thomas J. Schoenbaum, "Chapter 14. Collision and Marine Casualty," 2 *Admiralty & Mar. Law* § 14-3 (5th ed. updated Nov. 2013).  The presumption imposes a heavy burden" on the ship owner.  *Bunge*, 240 F.3d at 923.  The vessel owner can rebut the presumption in three different ways:  (1) showing that the allision was the fault of the stationary object; (2) showing that the moving vessel acted with reasonable care (presumably not possible where the rig is moved by wind and/or water during a storm out of the owner's control); or (3) showing that the allision was an unavoidable accident. e.g., and act of God.  Schoenbaum, 2

*Admiralty & Mar. Law* § 14-3; *Bunge*, 240 F.2d at 923, 926.  ENSCO, which bears the burden of persuasion to rebut the presumption that it was negligent, has not addressed nor provided evidence that the allision was the fault of the pipeline or that the unmooring was an accident or due to an Act of God that was not preventable by human skill and precaution.

Moreover given the presumption that ENSCO was negligent under the LOUISIANA rule, the "owner seeking liability must show that it lacked privity or knowledge of the condition (the presumably negligent mooring) that it could have obtained by reasonable investigation.  Neither party has addressed, no less submitted evidence, on this issue.

There is no evidence in the record about the mooring of the ENSCO 74, pre-storm, in the Gulf of Mexico, which is an area well known to be subject to severe storms and hurricanes.  There is no evidence about the forecast and warnings for Hurricane Ike.  Thus there is no evidence for the Court to determine whether ENSCO owed a duty of care to Sea Robin.  Moreover given the presumption of negligence that arises under the LOUISIANA rule, there is also no evidence showing whether ENSCO had knowledge of the condition (the presumably negligent mooring) or could have obtained it by reasonable investigation.  In sum, there is no evidence from which the Court can determine whether ENSCO owed a duty of care to Sea Robin and whether it breached such a duty.

Accordingly, even though ENSCO has made some strong arguments about causation, the unrebutted presumption of negligence controls and the failure of the parties to address the threshold issues makes ENSCO's motion for summary judgment premature. Accordingly the Court

ORDERS that ENSCO's motion for summary judgment (#98) is DENIED without prejudice.

**SIGNED** at Houston, Texas, this  26th  day of  March , 2014.

_____
MELINDA HARMON
UNITED STATES DISTRICT JUDGE

-42-